## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JIMMY LEE CRAWFORD, as | : | CIVIL ACTION NO. 1:23-CV-1380 |
| Administrator of the estate of | : | |
| JAMAL CRUMMEL, deceased, | : | (Judge Neary) |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| DAUPHIN COUNTY et al., | : | |
| | : | |
| Defendants | : | |

### MEMORANDUM

Plaintiff Jimmy Lee Crawford, in his capacity as the administrator of the estate of Jamal Crummel, (plaintiff hereinafter "Crawford"), is seeking justice for the tragic death of his son, who was detained in Dauphin County Prison ("DCP"). But federal pleading standards require plaintiffs to be specific, to put defendants on notice of what exactly they are being sued for, and Crawford's second amended complaint lacks the requisite specificity in many respects. Therefore, defendants' partial motions to dismiss will be granted and Dauphin County's and Warden Gregory Biggs's joint motion to strike will be denied.

### I. Factual Background & Procedural History

Crawford asserts claims against a variety of defendants, and these defendants are grouped by association: County Defendants, PrimeCare Defendants, Individual Defendants, and Dr. Garrett Rosas.

### A. The Defendants

The first targets of this lawsuit are the "County Defendants," Dauphin County, which owns the DCP, (Doc. 54 ¶ 5), and Gregory Briggs, the warden of DCP during the times relevant to this case. (Id. ¶ 13). Warden Briggs is being sued in both his individual and official capacities. (Id.).

The next group is PrimeCare Medical Inc. ("PrimeCare"), which is the company in charge of the medical needs of pre-trial detainees at DCP, (Id. ¶ 7), Thomas Webber, its CEO, and Todd Haskins, its COO, (Id. ¶ 14). The complaint also identifies an anonymous Medical Director for PrimeCare. (Id.). These three individuals ("PrimeCare Executives") are being sued in their individual and official capacities. (Id.).

Third, there are several individual medical defendants. Specifically, Crawford brings suit against Katie McGinn, Jessica Nye, Autumn Brennan, EMT, Cheree Sultzbach, Lauri Case, PMHNP-BC, Shade Crawford, PA, Tia Drabich, Addonna Thomas, LPN, Kayla Zeiders-Heichel, LPN, Mallory Stokes, LPN, Nicole Gallup, Carla Rotherman, Enos Martin, MD, Diane Wolfe, RN-HSA, Tykeisha Metz, MA, Johanna Reidel, MA, Stephanie Dietz, RN, Robert Nichols, PsyD., Kathryn Sciotti, CMA, Mildred Montalvo, MA, Claudia Jurado, Diana Cornejo, Mark Haney, Leslie Irons, LPN, Marielle Ritchie, Anna Bordner, LPN, Ryan Schmuck, RN, Eugenia Franklin, LPN, and Tashawana Gordon, MA, and John/Jane Does # 1-10 (collectively, "Individual Defendants"). (Id. ¶ 15).

Finally, Garrett Rosas, PsyD, is also a named individual defendant, (id.), however, he has separate counsel and will be treated apart from the other individual defendants. For the rest of the Individual Defendants, they are being represented together along with PrimeCare and its executives. The Individual Defendants and Dr. Rosas are being sued only in their individual capacities. (Id.).

### B. Facts

This case concerns the death of Jamal Crummel, and the events leading up to it. On September 15, 2021, Crummel was arrested for various charges and detained at DCP. (Doc. 54 ¶ 17). This was not Crummel's first incarceration at DCP and some DCP personnel were familiar with Crummel and the fact that he had schizophrenia. (Id. ¶ 18).

Crummel's stay at DCP involved troubles from the very beginning. During intake, Mildred Montalvo, MA, noted Crummel was experiencing mental health issues for which he had been hospitalized and been prescribed Haldol. (Id. ¶¶ 19-20). DCP initially placed Crummel on suicide watch. (Id. ¶ 23). A week after intake, Crummel was evaluated by Shade Crawford, MA, and Robert Nichols, PsyD, and removed from suicide watch. (Id. ¶ 25). A few days later, Crummel contracted COVID-19. (Id. ¶ 26). He had low oxygen levels and was taken to UPMC Harrisburg for the first of what would be three occasions during this particular stay at DCP. (Id.). A few days after returning to DCP from UPMC Harrisburg, on November 11, 2021, Crummel made a sick call request regarding a rash, tenderness, and bleeding in his scrotum area. (Id. ¶ 28). In response, he was seen by Marielle Ritchie who did

not examine Crummel, but prescribed Bacitracin. (Id. ¶¶ 29, 31). Despite the prescription, no one ever approved the order and Crummel never received Bacitracin. (Id. ¶ 32).

As the weeks passed, Crummel's mental health continued to deteriorate. On December 13, 2021, Cheree Sultzbach, LPN, noted Crummel was purposefully flooding his cell with water to the point that the water was leaking out under the cell door, and that he was severely agitated and not responding to external stimuli. (Id. ¶ 37). At this time, Crummel was also covered in feces and urine, and his cell was not adequately heated. (Id. ¶ 40). Three days later, Sultzbach, Susan Deloe, LPN, and Lauri Case, PMHNP-BC, reported Crummel's cell having a pungent smell, and there being vomit, food, urine, feces and water on the floor, and also that his physical health was rapidly declining. (Id. ¶ 42). Crummel's blood pressure was 188/102, his heart rate was 56 bpm, and he was cold to the touch. (Id. ¶ 43). As a result, Crummel was taken back to UPMC Harrisburg, but stayed there less than 24 hours before being returned to DCP. (Id. ¶ 44).

By December 17, 2021, Case noted Crummel's cell was still flooded and scattered with food debris. (Id. ¶ 45). Two days later, Tia Drabich and Stephanie Deitz, RN, examined Crummel and discovered he had slurred speech, dry oral mucosa, macerated skin on his hands and feet, incontinence, tachycardia, was breathing abnormally, and smelled of urine. (Id. ¶ 48). Someone passed along the status of Crummel's condition to PrimeCare COO Todd Haskins via email before Crummel was transferred to UPMC Harrisburg for the third time. (Id. ¶¶ 51-52).

The hospital noted Crummel was bradycardic (had a slow heart rate) and hypotensive (abnormally low blood pressure), appeared physically ill, and had a core body temperature of 85 degrees Fahrenheit. (Id.).

After examining Crummel, doctors determined he had a host of ailments. For one, he had cherry red non-blanching rash on his medial thighs, tip of his penis, buttocks, and lower back region, and his skin was sloughing on his bilateral wrists and feet. (Id. ¶ 54). Additional testing indicated Crummel had an acute kidney injury and leukopenia, abnormal blood glucose, lactic acid, c-reactive protein and creatine readings, and Systematic Inflammatory Response Syndrome ("SIRS"), which is an exaggerated defense response of the body to a noxious stressor such as infection or acute inflammation. (Id. ¶ 56). Though Crummel had made a sick call request about his rash, Nicole Gallup informed UPMC Harrisburg only that he had been incontinent and smelled of urine; she told the hospital that no one from DCP was aware of any rash on Crummel. (Id. ¶ 59). UPMC doctors later determined Crummel's rash was Stevens-Johnson Syndrome/Toxic Epidermal Necrolysis ("SJS/TEN"). (Id. ¶ 60). From December to January, Crummel spent a total of 36 days at UPMC Harrisburg and returned to DCP on January 24, 2022. (Id. ¶ 65).

Conditions in DCP were cold in January and Crummel's cell still did not have separate heating. (Id. ¶¶ 66-67). By late January, Crummel became delusional and stopped taking his medications. (Id. ¶¶ 71-73). Just before 8:00 a.m. on January 31, Dr. Rosas did a visual check on Crummel and noted he was lying face down, facing interior the wall (away from window), partially covered as his right leg and a

blanket were hanging partially off the bed. (Id. ¶ 76). Dr. Rosas believed there to be no signs of medical distress at the time, but never talked to Crummel. (Id.). At approximately 9:30 a.m., staff noticed Crummel was unresponsive and not breathing. (Id. ¶¶ 77-78). Crummel was not revived and died of hypothermia on January 31, 2022. (Id. ¶¶ 80-81).

### C. Procedural History

Crawford initiated this suit on August 18, 2023, when he filed the original complaint. (Doc. 1). On November 13, 2023, Crawford filed a first amended complaint as a matter of course in accordance with Rule 15. FED. R. CIV. P. 15(a)(1)(B); (Doc. 18). The various defendants then filed partial motions to dismiss the first amended complaint in accordance with Rule 12. (Docs. 24, 25, 27, 28, 37). Then, on January 17, 2024, Crawford's initial counsel requested to stay all deadlines as new counsel for the plaintiff would be making an appearance. (Doc. 43). This motion had the concurrence of all parties, (id.), and was granted by the court, (Doc. 45). Current counsel for Crawford entered their appearances on January 19, 2024. (Docs. 46, 47).

On February 26, 2024, all parties reported they were ready to proceed and Crawford's current counsel specifically reported they would "respond to and oppose the pending Motions to dismiss within fourteen days of the Court's Order lifting the stay." (Doc. 52). On March 11, 2024, the court lifted the stay. (Doc. 53). Two weeks later, Crawford's current counsel—without seeking consent of the parties or leave of the court—filed a second amended complaint. (Doc. 54). The court then denied the

pending motions to dismiss as moot due to the new, second amended complaint. (Doc. 55). In response, PrimeCare filed a new partial motion to dismiss on behalf of itself, the PrimeCare defendants, and the Individual Defendants, (Doc. 57), and Dr. Rosas filed a new motion to dismiss to end all claims against him, (Doc. 59). Dauphin County filed a motion to strike the second amended complaint or, in the alternative, a new partial motion to dismiss.[1] (Doc. 60). Briefing on the latest round of motions is complete and this matter is ripe for disposition. (Docs. 63, 64, 65, 66, 67, 68, 69, 70).

## II.  <u>Legal Standards</u>

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. <u>See</u> FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008) (quoting <u>Pinker v. Roche Holdings, Ltd.</u>, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." <u>Phillips</u>, 515 F.3d at 232 (alteration in original) (quoting <u>Bell Atl. Corp. v. Twombly</u>,

---

[1] This motion also sought relief under Rule 60. (Doc. 60 ¶¶ 42-46). However, the County never specifically explains *how* the court should modify a previous order or the record. As such, it treats this request as abandoned.

550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint, the court conducts a three-step inquiry. See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556). A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.

Under Federal Rule of Civil Procedure 12(f), the court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). District courts have "considerable discretion" in resolving a Rule 12(f) motion. Krisa v. Equitable Life Assurance Soc'y, 109 F. Supp. 2d 316, 319 (M.D. Pa. 2000) (quoting N. Penn. Transfer, Inc. v. Victaulic Co. of Am., 859 F. Supp. 154, 158 (E.D. Pa. 1994)). In general, such a motion will be denied unless the allegations are severely prejudicial to one of the parties and unrelated to the plaintiff's claims. Id.; see also 5C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1382 (3d ed. 2016). A party is prejudiced when the challenged pleading "confuses the

issues" or places an undue burden on the responding party. <u>Karpov v. Karpov</u>, 307 F.R.D. 345, 348 (D. Del. 2015).

### III.    <u>Discussion</u>

Crawford's second amended complaint contains eight counts against the defendants. Counts II, VII, and VIII[2] are against all defendants and allege inhumane conditions of confinement violating Crummel's civil rights through 42 U.S.C. § 1983, a Wrongful Death Act action under 42 Pa. C.S. § 8301, and a Survival Act action under 42 Pa. C.S. § 8302, respectively. Count I alleges inadequate medical care violations of Crummel's civil rights in violation of 42 U.S.C. § 1983 against all individual defendants except for Warden Briggs. Crawford asserts violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*, against Dauphin County in Count III. In Count IV, Crawford brings <u>Monell</u> claims against PrimeCare, Dauphin County, Warden Briggs, CEO Webber, and COO Haskins. Count V alleges corporate and gross negligence against PrimeCare. Finally, Count VI alleges negligence and vicarious liability against PrimeCare, the Individual Defendants, and Dr. Rosas.

The pending motions to dismiss have two areas of overlap. First, each motion seeks to dismiss at least some claims on the grounds that the complaint fails to establish defendants acted with "deliberate indifference." To prevail on a claim that prison officials violated a detainee's rights regarding his health or safety, a plaintiff must show the prison officials acted with deliberate indifference. <u>See</u> <u>Farmer v.</u>

---

[2] Mis-labeled as a duplicative Count VII in the complaint. (Doc. 54 at 34-36).

Brennan, 511 U.S. 825, 834 (1994) (citations omitted).[3] A person acts with deliberate indifference when they "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

In the medical context, deliberate indifference is proven where a plaintiff shows "that prison officials knew of and disregarded 'an excessive risk to inmate health or safety,' meaning a 'substantial risk of serious harm.'" Durham v. Kelley, 82 F.4th 217, 229 (3d Cir. 2023) (quoting Farmer, 511 U.S. at 837). "Indifference to a substantial risk of serious harm is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, or a denial of reasonable requests for treatment that leads to suffering or risk of injury." Id. at 230 (citing Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993)).

The second similarity among the motions to dismiss is that each asserts some allegations in the second amended complaint lack needed specificity. Rule 8 of the Federal Rules of Civil Procedure requires pleadings contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(1). The reason for this rule is to "provide fair notice of 'what the . . . claim is and

---

[3] While Farmer deals with a convicted prisoner's rights under the Eighth Amendment, 511 U.S. at 828-29, the Third Circuit applies the same standards for claims by pre-trial detainee's suing under the Fourteenth Amendment, see Hubbard v. Taylor, 399 F.3d 150, 166 n.22 (3d Cir. 2005).

the grounds upon which it rests.'" <u>Garrett v. Wexford Health</u>, 938 F.3d 69, 92 (3d Cir. 2019) (quoting <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007) (per curiam)). In other words, complaints must pass the newspaper test—they must offer "the who, what, when, where, and how." <u>See</u> <u>Badia v. Warden, HCCC</u>, No. CIV. 10-5662 JLL, 2011 WL 221709 *3 (D.N.J. Jan. 19, 2011) (quoting <u>Advanta Corp. Sec. Litig.</u>, 180 F.3d 525, 534 (3d Cir. 1999)).

**A. Dauphin County and Warden Briggs**

The County Defendants seek to strike the second amended complaint or, in the alternative, seek dismissal of Count II as to Warden Briggs, Count III in its entirety, Count IV as to Warden Briggs, as well as dismissing the requests for punitive damages against Dauphin County or Warden Briggs in his official capacity. Addressing the motion to strike first, at the outset, the County Defendants have not identified any prejudice they would suffer if the court does not strike the second amended complaint. At most, the County Defendants complain about deception on the part of the plaintiff in seeking requests for additional time to respond to the original motions to dismiss rather than draft a new complaint. (<u>See</u> Doc. 65 at 13-14). Yet requests for extension of time are routinely granted, regardless of the reason. <u>See</u> <u>Cox v. United Parcel Serv., Inc.</u>, No. 15-CV-2013, 2017 WL 3189022 *2 (M.D. Pa. July 26, 2017), <u>aff'd,</u> 753 F. App'x 103 (3d Cir. 2018). Moreover, the County Defendants claim the second amended complaint is "redundant" as it brings the same claims as the previous one. (Doc. 65 at 11-12). To the extent the second amended complaint is redundant, though the County Defendants may have "briefed

the issues before this Court extensively," (id. at 13), they may largely reuse that same briefing if not copy it verbatim, eliminating any articulable prejudice. Finally, if the claims are indeed the same between the first amended complaint and the second amended complaint, ruling on the latter will give the County Defendants the relief they ultimately seek—"a ruling on the merits of their Motion to Dismiss." (Id. at 12).[4] Therefore, the County Defendants' motion to strike will be denied.

Turning to the merits of the County Defendants' motion to dismiss, there is a sizable amount of common ground. Crawford concedes the ADA is inapplicable to this case and punitive damages are unavailable against a municipality for suits brought under 42 U.S.C. § 1983. (Doc. 68 at ECF 9). Accordingly, Count III will be dismissed in its entirety and claims for punitive damages against Dauphin County will be dismissed for all counts where that demand is present.

Stripped down, both parties ultimately agree there is no Monell claim against Warden Briggs in his personal capacity. (Doc. 65 at 23; Doc. 68 at ECF 13). This is because the Third Circuit has made clear Monell claims cannot be brought against individuals in their personal capacity. See Mervilus v. Union Cnty., 73 F.4th 185, 197 n.5 (3d Cir. 2023). In his brief, Crawford clarifies his Monell claim against Dauphin County is "predicated on [Warden Briggs's] actions." (Doc. 68 at ECF 13).

---

[4] This is not to say the court condones the actions of plaintiff's counsel. Counsel has not offered any explanation for their misleading representations to opposing counsel, much less made an apology. The court expects plaintiff's counsel to be diligent in their adherence to the rules going forward, especially their duty of candor and responsibility of seeking the concurrence of opposing counsel when filing motions or amended complaints.

This is because Warden Briggs served as a policy maker acting on behalf of Dauphin County. (Id.). Still, Count IV lists Warden Briggs, in addition to the Dauphin County, as being liable under Monell. To clear any confusion, all claims asserted against Warden Briggs in his individual capacity on Count IV will be dismissed. But Crawford's claim against Dauphin County, using the policies and actions of Warden Briggs and foundational support, shall survive.

The County Defendants and Crawford clash over to what extent Warden Briggs remains a part of this lawsuit. To begin, Warden Briggs asserts he is protected by qualified immunity for the remaining counts against him—Counts II and III. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (internal quotation marks omitted).

Warden Briggs argues Crawford suffered no violation of a constitutional right because he did in fact receive medical care. (Doc. 65 at 25). Crawford responds Warden Briggs is liable not for alleged inadequate medical care, but for unsanitary and deplorable prison conditions. (Doc. 68 at ECF 12-13). Warden Briggs never addresses this argument. Crawford, for his part, also fails to point to a clear case showing the right was clearly established. Rather, he simply cites a case called "Wilson" in 2001. (Id. at ECF 12). The court's best guess is that Crawford was referring to Wilson v. Seiter, a Supreme Court case from *1991*. 501 U.S. 294. Yet, by

its own terms, that case only addressed "whether a prisoner claiming that conditions of confinement constitute cruel and unusual punishment must show a culpable state of mind on the part of prison officials," and so is not directly applicable. Id. at 296.

Fortunately for Crawford, it is the defendant who bears the burden of establishing a qualified immunity defense. Stringer v. Cnty. of Bucks, 141 F.4th 76, 86 (3d Cir. 2025). Moreover, this burden is notoriously difficult for defendants to meet on a motion to dismiss. Id. at 86-87. In any event, Taylor v. Riojas was issued before the events alleged in the complaint took place and firmly establishes that prison officials are deliberately indifferent and violate a detainee's rights when they are kept in a "frigid cold cell" that is covered in human feces. 592 U.S. 7, 8 (2020). Given the facts alleged where Crummel is to have been sleeping in his own urine, feces, and in a cold cell, (Doc. 54 ¶¶ 35, 40-42, 68), this is sufficient to defeat Warden Briggs's invocation of qualified immunity on the motion to dismiss.

In the alternative, Warden Briggs also argues he should be spared from any individual liability, and the punitive damages that could come along therewith. He argues Crawford "failed to demonstrate personal involvement of Warden Briggs, beyond mere conclusory language and unsupported assertions." (Doc. 65 at 23). That is correct. The second amended complaint alleges Warden Briggs "knew that [Crummel] had been allowed to remain for days in his cell, covered in feces and unrine [sic] and in wet conditions caused by the flooding of the cell." (Doc. 54 ¶ 89). "Allegations of participation or actual knowledge and acquiescence, however, must

be made with appropriate particularity." <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1208 (3d Cir. 1988). Crawford's charge that Warden Briggs knew of Crummel's condition is a mere "bare assertion[]" reciting an element necessary (knowledge) to prove a claim. <u>See</u> <u>Iqbal</u>, 556 U.S. at 681 (quoting <u>Twombly</u>, 550 U.S. at 555). The complaint does not include any specific allegations of the actions, or non-actions, undertaken by Warden Briggs that violated Crummel's civil rights. Accordingly, all claims against him will be dismissed.

### B. Dr. Rosas

Crawford also asserted claims against Dr. Rosas; however, the only time Dr. Rosas is specifically mentioned in the complaint is one event on the day Crummel died. Crawford alleges Dr. Rosas created a note documenting that around 7:50 a.m., he went to see Crummel who "was in some type of agitated state that represented a mental status change that occurred at some point over the weekend." (Doc. 54 ¶ 76). The doctor made the visit to observe Crummel's status and he reported him "laying face down, facing interior wall (away from window), partially covered as right leg and also blank [sic] were hanging off partially off the bed. Slight movement observed, no distress or signs of acute medical event observed." (Id. ¶ 54).

This allegation is insufficient to plead a case against Dr. Rosas. As an initial matter, there is no allegation of deliberate indifference. That requires that an "official knows of and disregards an excessive risk to inmate health or safety." <u>Farmer</u>, 511 U.S. at 837. Nothing in the complaint establishes Dr. Rosas knew of an excessive risk to Crummel's health. The specific allegation against him is that he

was checking on Crummel's "agitated state." (Doc. 54 ¶ 76). By itself, being in an agitated state does not create an excessive amount of risk to one's wellbeing. Additionally, when Dr. Rosas observed Crummel, he saw slight movement which indicates Crummel was somewhat responsive. (Id.). Therefore, the complaint fails to attribute to Dr. Rosas actual knowledge of Crummel's perilous condition.

Crawford protests that his complaint sufficiently alleges that Dr. Rosas was aware of Crummel's condition because it "was documented in the medical chart and because Dr. Rosas received a verbal update from nursing staff that morning stating that Crummel was deteriorating." (Doc. 67 at 10). Although this argument is made in Crawford's brief, he does not provide citation to his own complaint which would substantiate this point. Looking at the second amended complaint, Crawford only alleges nursing staff told Dr. Rosas that Crummel was "agitated," nothing more. (Doc. 54 ¶ 76). As for the allegation there was documentation of Crummel's deteriorating condition in the medical chart, that allegation is simply not in the complaint (which itself never uses the word "chart"). Moreover, the only time the complaint uses the general term, "medical records," it is in reference to documentation of the physical conditions of Crummel's cell, not his medical status. (Doc. 54 ¶¶ 46, 50). Finally, the complaint is completely silent on what exactly the "medical records" are, what specific information they contained, who had access to them, who actually read them, and when people actually read them. Without this information, Crawford fails to plead that Dr. Rosas actually knew of the risks Crummel faced.

Nor has Crawford pled sufficient allegations against Dr. Rosas concerning medical malpractice. Both parties agree that in Pennsylvania, to establish a prima facie case of malpractice, the plaintiff must establish (1) a duty owed by the physician to the patient; (2) a breach of duty from the physician to the patient; (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) damages suffered by the patient that were a direct result of that harm. (Doc. 63 at 12; Doc. 67 at 12); Mitzelfelt v. Kamrin, 584 A.2d 888, 891 (Pa. 1990). At the same time, there is no requirement a physician "be infallible, and making a mistake is not negligence as a matter of law." Thierfelder v. Wolfert, 52 A.3d 1251, 1265-66 (Pa. 2012) (quoting Toogood v. Owen J. Rogal, D.D.S., 824 A.2d 1140, 1150 (Pa. 2003)). The complaint does not identify how Dr. Rosas breached a duty owed to Crummel. Rather, it only says all defendants failed to "render reasonable, proper, adequate and appropriate medical care" to Crummel. (Doc. 54 ¶ 127). Nowhere does the complaint specify what duty of care Dr. Rosas failed to uphold and how. The "sweeping conclusions" contained in the second amended complaint are not supported by the requisite facts, and as such, the medical negligence claims against Dr. Rosas will be dismissed. See McCracken v. Fulton Cnty., No. 3:19-CV-1063, 2020 WL 2767577 *10 (M.D. Pa. May 28, 2020).

Last, Crawford mischaracterizes Dr. Rosas's argument on the Wrongful Death Act, 42 Pa. C.S. § 8301, and the Survival Act, 42 Pa. C.S. § 8302. Both parties acknowledge these claims are "are derivative of [a] decedent['s] injuries." (Doc. 63 at

13; Doc. 67 at 14); <u>Pisano v. Extendicare Homes, Inc.</u>, 77 A.3d 651, 660 (Pa. Super. Ct. 2013). Per Crawford, Dr. Rosas's argument is that, because they are derivative claims, Dr. Rosas believes they should be included in Counts I and II and not separately stated. (Doc. 67 at 14-15). This is incorrect. The point is rather these claims only exist by virtue of the allegations in Counts I and II. Because the court is dismissing all the other claims against Dr. Rosas, there is not a basis to assert claims under the Wrongful Death Act or the Survival Act as there are no remaining allegations showing Dr. Rosas caused an injury to Crummel. Thus, all claims against Dr. Rosas will be dismissed.

### C. PrimeCare and the Individual Defendants

With the County's and Dr. Rosas's arguments resolved, the court turns its attention to PrimeCare and the Individual Defendants.

#### 1. Individual Defendants

PrimeCare argues Crawford simply "lumps all of the [] Defendants together with no delineation." (Doc. 64 at 9). As such, it asks for dismissal due to a lack of showing personal involvement. (<u>Id.</u> at 11). For quite a few of the Individual Defendants, PrimeCare is correct. Adrienne Freeman is only listed in the caption of the complaint and nowhere else. One defendant is just referred to as "Sheely" and no other identifying information has been given, nor was this individual named as a party. (Doc. 54 ¶ 83). Additionally, the second amended complaint is devoid of any specific facts against defendants Ms. McGinn, Ms. Nye, Ms. Zeiders, Ms. Rotherman, Nurse Wolfe, Nurse Dietz, Ms. Sciotti, Ms. Jurado, Ms. Cornejo, Mr.

Haney, Nurse Irons, Nurse Bordner, Nurse Schmuck, Nurse Franklin, and John/Jane Does # 1-10. It simply says these individuals knew Crummel "suffered from schizophrenia" and failed to treat him. (Id. ¶ 36). Yet the complaint does not state when each defendant acted or failed to act in an illegal way. To survive a motion to dismiss, a complaint must put a defendant on notice by explaining "who did what to whom when." See Cupp on behalf of Cupp v. Cnty. of Lycoming, No. 3:20-CV-001784, 2021 WL 4478304 *5 (M.D. Pa. Sept. 30, 2021) (quoting Mills v. Ethicon, Inc., 406 F. Supp. 3d 363, 387 (D.N.J. 2019)). Because the second amended complaint lacks specifics as the actions or nonactions of these defendants, claims against them will be dismissed.

Further, a notice of death was filed for Dr. Robert Nichols, (Doc. 44), and no motion to substitute another party has been filed by Crawford. As such, all claims against Dr. Nichols will be dismissed. See FED. R. CIV. P. 25(a)(1).

While other named defendants had some level of interaction with Crummel, it was insufficient to form the basis for liability. For example, Ms. Metz, Ms. Reidel, Ms. Brennan, Ms. Gordon, and Nurse Magwood are alleged to have seen Crummel after he stopped eating on January 26, but that is the extent of their interactions. (Doc. 54 ¶ 83). It is not clear what "seen" is supposed to mean or how any of these defendants are alleged to have denied Crummel some treatment or contributed to his living in deplorable prison conditions. Similarly, Nurse Thomas's only interaction was at one point documenting Crummel's refusal to take his medication and his lying on the bed, saying nothing. (Id. ¶ 54). Ms. Montalvo is only mentioned

doing intake when Crummel was first admitted to DCP. (Id. ¶ 19). Dr. Martin's only involvement is seeing Crummel in the medical office about a week before he died and describing his condition. (Id. ¶ 71). Nurse Stokes was only around during the morning "pill call" the day Crummel died. (Id. ¶ 77). Similar to Dr. Rosas, none of these interactions establish these defendants knew of the serious risks Crummel faced and ignored them. Therefore, there is no personal involvement for these defendants and the claims against them must be dismissed.

Other defendants had a touch more interaction with Crummel, but still nothing to create a nexus between that interaction and liability. Ms. Drabich and Nurse Deitz, are alleged to have to have examined Crummel and discovered he "had slurred speech, dry oral mucosa, macerated skin on his hands and feet, incontinence, tachycardia, was breathing abnormally and smelled of urine." (Doc. 54 ¶ 48). Yet, the same day, Crummel was taken to the hospital. (Id. ¶ 51). Therefore, there is nothing alleged to establish Ms. Drabich or Nurse Deitz were deliberately indifferent to Crummel's condition; he was seen and then received treatment in the form of being taken to a hospital. Shade Crawford conducted an initial exam of Crummel, but had no other interaction with him except "seeing" him some time after January 26. (Id. ¶¶ 25, 83). Again, nothing alleged shows Shade Crawford knew of Crummel's decrepit condition and ignored it.

Similarly, Nurses Sultzbach, Deloe, and Case may have documented that Crummel was in deplorable conditions. (Id. ¶ 42). Though, after seeing him like that, Crummel was sent to the hospital for treatment. (Id. ¶ 44). Given this,

Crawford cannot show these nurses were deliberately indifferent. They saw the state Crummel was in, and he was sent to the hospital. No care was denied, rather corrective action was taken. See Brooks v. Steberger, No. 23-CV-4535, 2024 WL 1181460 *6 (E.D. Pa. Mar. 19, 2024) (finding no deliberate indifference where detainee was taken to the hospital in response to various symptoms); White v. Dauphin Cnty., No. 1:22-CV-1241, 2023 WL 6392735 *9 (M.D. Pa. Sept. 29, 2023).

This just leaves Ms. Ritchie. She is alleged to have responded to one of Crummel's sick call requests, but did not examine him in any way. (Id. ¶¶ 29-31). However, the complaint also explains she prescribed Bacitracin to Crummel. (Id. ¶ 31). True, the Bacitracin was never approved, but the complaint is mum on who failed to approve it. (Id. ¶ 32). While a close call, Crawford has failed to allege a claim against Ms. Ritchie. After seeing Crummel, she prescribed a treatment. Perhaps such treatment may have been inadequate or ineffective, perhaps she should have done more, but such concerns "would sound in negligence as a malpractice suit, and do[] not constitute deliberate indifference." Weigher v. Prison Health Servs., 402 F. App'x 668, 670 (3d Cir. 2010) (nonprecedential). The complaint does not allege it was Ms. Ritchie who failed to give Crummel the medicine and so there are no allegations she was deliberately indifferent to his condition.

Nor can there be any claim for punitive damages. For one, while Crawford claims defendants' motions to dismiss for punitive damages are often denied, (Doc. 66 at ECF 19), the case they cite for that proposition limited such analysis to "motor

vehicle accident cases." <u>Harvell v. Brumberger</u>, No. 3:19-CV-2124, 2020 WL 6947693 *8 (M.D. Pa. Nov. 4, 2020), <u>report and recommendation adopted</u>, No. 3:19-CV-2124, 2020 WL 6946575 (M.D. Pa. Nov. 25, 2020). To establish punitive damages, a plaintiff must show recklessness or indifference. (<u>See</u> Doc. 66 at ECF 19; <u>Smith v. Wade</u>, 461 U.S. 30, 54 (1983); <u>Hutchison v. Luddy</u>, 870 A.2d 766, 770 (Pa. 2005)). Because no claims of deliberate indifference survive, Crawford's complaint has no basis for punitive damages. Therefore, the requests for punitive damages shall be dismissed.

### 2. PrimeCare Executives

As an initial matter, the only individualized allegation against the PrimeCare Executives is against COO Haskins. The second amended complaint alleges someone contacted COO Haskins about Crummel's condition on December 19, 2021. (Doc. 54 ¶ 51). However, as that same paragraph notes, that day, Crummel was taken to the hospital. (<u>Id.</u>). Therefore, there cannot be any claims against COO Haskins. To the extent he was aware of Crummel's condition, it was right before Crummel received treatment in the form of being taken to the hospital. So, no care was denied and there cannot be a claim of deliberate indifference. <u>See</u> <u>Durham</u>, 82 F.4th at 230 (citing <u>Durmer</u>, 991 F.2d at 68).

As for CEO Thomas Webber and Corporate Medical Director John Doe, there were no specific allegations made against these men. Because the second amended complaint does not give the who, what, when, where, and how connecting these men to Crummel's plight, they will be dismissed from Counts I and II.

The last argument for the court to consider is PrimeCare's request to dismiss Crawford's Monell claim against it. A plaintiff's assertion of liability against an entity in the civil rights context can be sustained based on the U.S. Supreme Court's ruling in Monell v. New York City Department of Social Services. Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 583-84 (3d Cir. 2003). In making this Monell claim, the entity is not liable through respondeat superior or vicarious liability; rather, plaintiffs must show "there was a relevant [ ] policy or custom, and that the policy caused the constitutional violation they allege." Id.

Crawford has two theories of Monell liability: (1) there is a pattern of deliberate indifference to the serious medical and mental health needs of inmates; and (2) a systemic failure to provide for adequate conditions in prison cells. As to the latter claim, there is no allegation in the second amended complaint asserting PrimeCare had any authority over the conditions of the prison cells, including water or heating issues. Therefore, it is impossible for PrimeCare to have a policy or custom that caused harm to Crummel in this respect. See Kranson v. Valley Crest Nursing Home, 755 F.2d 46, 51 (3d Cir. 1985) (quoting Losch v. Borough of Parkesburg, 736 F.2d 903, 910 (3d Cir.1984)) (requiring a plaintiff to attribute a policy to a defendant-entity).

Moreover, given the analysis above, the second amended complaint fails to allege any individual acted with deliberate indifference towards Crummel. While true that it is possible for some Monell claims to lie, even when no individual is liable, that is only true when there is still an underlying constitutional violation.

See Mervilus v. Union Cnty., 73 F.4th 185, 196-97 (3d Cir. 2023). The second amended complaint fails to show anyone acted with deliberate indifference towards Crummel with respect to his medical care.[5] Nowhere does Crawford show someone knew of Crummel's serious medical issues and failed or refused to provide him with any treatment. Accordingly, there is no underlying constitutional violation and so the Monell claims against PrimeCare must be dismissed.

**D. Leave to Amend**

The final task is to determine which of Crawford's claims must be denied with prejudice and which claims he may be allowed to reassert with amendment. When a claim is being dismissed in a civil rights case, the plaintiff must be given leave to amend "unless doing so would be inequitable or futile." Mullin v. Balicki, 875 F.3d 140, 151 (3d Cir. 2017) (citation omitted). For several of the dismissed claims, even Crawford admits there is not legal basis to support them. As he concedes the ADA is inapplicable and that punitive damages are unavailable against a municipality for suits brought under section 1983, (Doc. 68 at ECF 9), amendment on those points would be futile. So, Count III will be dismissed with prejudice along with all claims for punitive damages against Dauphin County. Crawford likewise acknowledges claims cannot be asserted against individuals for Monell liability, (id. at ECF 13), so Warden Briggs, CEO Webber, and COO Haskins shall be dismissed with prejudice from Count IV as individuals. Finally, a

---

[5] The situation may be different with respect to the conditions in his cell. However, those conditions would be controlled by Dauphin County which has not moved for dismissal regarding the Monell claim against it.

suggestion of death was filed for Dr. Nichols on January 18, 2024. (Doc. 44). As no motion to substitute a party has been made, amendment with respect to claims against him would be futile, <u>see</u> FED. R. CIV. P. 25(a)(1), and claims against him shall be dismissed with prejudice.

As to the rest of Crawford's claims, no defendant has articulated a basis for why granting leave to amend would be inequitable or futile. While "repeated failure[s] to cure deficiencies by amendments previously allowed" is a factor to consider, <u>Mullin</u>, 875 F.3d at 149, this is the first time the viability of Crawford's claims have been addressed by a court. Moreover, even if no amendments were made, Crawford's suit would still continue on involving many of the same defendants. Even to the defendants who would not have claims against them, they could still be involved with discovery and possibly trial. Any prejudice to the defendants would therefore be minimal. <u>See</u> <u>id.</u> at 155-57. Thus, as to dismissal of the rest of Crawford's claims, it shall be without prejudice and he shall have leave to file an amended complaint.

## IV.    <u>Conclusion</u>

The County's motion to strike will be denied. Otherwise, its motion to dismiss, along with the motions to dismiss of Dr. Rosas and PrimeCare in their entirety, will be granted. Though, not all claims will be dismissed with prejudice. To recap, the following claims are dismissed with prejudice:

i)   All claims in Count III;

ii)  All claims against Dr. Robert Nichols;

iii) All claims for punitive damages against Dauphin County; and

iv) The claims against Warden Briggs, CEO Webber, and COO Haskins in their individual capacities as stated in Count IV.

The following claims are dismissed without prejudice:

i)   All claims in Count I;

ii)   All claims in Count II except as to those against Dauphin County Prison;

iii) All claims in Count IV with respect to PrimeCare;

iv) All claims against Warden Briggs in his individual capacity; and

v)  All claims with respect to punitive damages against PrimeCare, the PrimeCare Executives, Dr. Rosas, and the Individual Defendants.

An appropriate order shall issue.


/S/ KELI M. NEARY
Keli M. Neary
United States District Judge
Middle District of Pennsylvania


Dated:    October 30th, 2025