**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JIMMY LEE CRAWFORD, AS ADMINISTRATOR OF THE ESTATE OF JAMAL CRUMMEL, DECEASED** | : | **CIVIL ACTION NO. 23-cv-01380** |
| **Plaintiff,** | : | |
| **v.** | : | |
| **DAUPHIN COUNTY and GARRETT ROSAS and PRIMECARE MEDICAL, INC.** | : | **JURY TRIAL DEMANDED** *Electronically Filed* |
| **Defendants.** | : | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

### I. PRELIMINARY STATEMENT

On January 31, 2022, Decedent, Jamal Crummel ("Decedent" or "Mr. Crummel"), a pretrial detainee, died in Dauphin County Prison ("DCP") from hypothermia and numerous serious medical conditions that went untreated by Defendants. Plaintiff, Jimmy Lee Crawford, brings this lawsuit against Defendants on behalf of his son, Jamal Crummel, pursuant to 42 U.S.C. § 1983, alleging Due Process claims for Inadequate Medical Care and Inhuman Conditions of Confinement, as well as numerous Pennsylvania State Law Claims. The negligent medical care claim stems from Defendants' failure to diagnose, treat, and accommodate Mr. Crummel's schizophrenia, decompensating mental condition, and

Steven Johnson Syndrome ("SJS")/Toxic Epidermal Necrolysis ("TEN"), which is a serious, life-threatening, extremely painful skin disease that damages the skin and mucous membranes and results in rashes, blisters and peeling skin that resembles severe hot water burns. The inhuman conditions of confinement claim stems from Mr. Crummel's incarceration in a cell, by himself, for twenty-four hours a day, that was covered in his feces, urine, and water. Mr. Crummel was required to endure these conditions suffering from a painful, potentially fatal skin disease, during the winter months of December and January, wearing a tee shirt and thin prison pants, in a prison cell that had no heat and/or inadequate heat, resulting in his death by hypothermia.

Plaintiff alleges Dauphin County has a long-standing practice of sanctioning this type of mistreatment of its inmates. According to news report[1], rather than fix the HVAC system, allow inmates out of their cells for more than one hour each day, or instruct correctional officers to open decedent's cell door to allow warmer air to circulate, Prison Warden Gregory Briggs "agreed to give prisoners on **some** cell blocks thermal shirts…" Further, according to news reports, in 2019, prisoners stated it was "so cold they can see their breath." Meanwhile, decedent was allowed to freeze to death in his cell while he was not covered in the extra thermal shirts or extra blankets and was essentially ignored for hours and allowed to suffer.

[1] https://www.witf.org/2022/06/07/dauphin-county-jail-cells-were-ice-cold-days-before-a-prisoner-died/

According to another news report[2], a whistleblower complaint was filed alleging that PrimeCare Medical, Inc. ("PrimeCare") and DCP officials were aware of and condoned detainees being placed on suicide watch in freezing cold cells. A high-ranking PrimeCare psychologist allegedly stated, "F*ck him, he can freeze in that smock" in regard to another detainee who froze to death in his cell at DCP in 2022.

## II. JURISDICTION

1. This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343 (a)(4) and 1367(a).

2. Venue is proper pursuant to 28 U.S.C. § 1391(b) because the cause of action upon which the complaint is based arose in Dauphin County, Pennsylvania, which is in the Middle District of Pennsylvania.

## III. PARTIES

3. Plaintiff, Jimmy Lee Crawford, is an adult citizen and resident of the State of Pennsylvania and was at all relevant times the father of Jamal Crummel, and the administrator of his estate.

4. At all relevant times, Jamal Crummel was a pretrial detainee at Dauphin County Prison, who was under the care, custody and control of Defendants.

5. Defendant, Dauphin County, is an entity or political subdivision organized and existing under the laws of the Commonwealth of Pennsylvania, and

---

[2] https://www.prisonlegalnews.org/news/2023/dec/1/fuck-him-he-can-freeze-pennsylvania-detainees-death-detailed-suit-against-primecare/

at all relevant times owned, operated, managed, maintained, and was otherwise responsible for the pretrial detainees at DCP, including the Deceased.

6. At all relevant times, Defendant Dauphin County acted or failed to act through its employees, agents, servants, and/or contactors, then and there acting in the course and scope of their employment, agency, servanthood, and/or contract, including but not limited to the individually named defendants.

7. At all relevant times, Defendant Dauphin County was charged with housing, supervising, and caring for the pretrial detainees at "DCP" and they delegated their constitutional duty of providing medical care of said pretrial detainees to PrimeCare Medical, Inc.

8. At all relevant times, Defendant Dauphin County was charged with maintaining DCP, including ensuring that the jail cells were clean and habitable, and had sufficient heat during the winter months.

9. Defendant, PrimeCare Medical, Inc. ("PrimeCare"), is a business entity organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in Harrisburg, PA.

10. At all relevant times, Defendant PrimeCare acted or failed to act through its employees, agents, servants, and/or contactors, then and there acting in the course and scope of their employment, agency, servanthood, and/or contract, including but not limited to the individually named defendants

11. At all times, Defendants Dauphin County and PrimeCare were responsible for the testing, hiring, training, supervising, and disciplining individuals staffed at "DCP," including, but not limited to, the named individual defendant.

12. Defendant PrimeCare Medical Provider Garrett Rosas, Psy.D. is an adult individual and resident of the Commonwealth of Pennsylvania, who, at all relevant times, was employed as a medical provider at DCP by PrimeCare and/or Dauphin County.

13. Defendant Medical Provider Garrett Rosas ("Rosas") was acting within the course and scope of his employment, under the color of state law, and pursuant to the customs, policies, and practices of Defendants Dauphin County and/or PrimeCare. He is being sued in his individual capacity.

## IV. OPERATIVE FACTS

14. On September 15, 2021, Mr. Crummel, a 45-year-old male, was arrested on numerous charges and committed to DCP.

15. This was not the Decedent's first incarceration at DCP, and based on his prior incarceration at the prison, it was noted that Mr. Crummel suffered from schizophrenia, and that during his prior incarceration he had psychological/mental health issues, for which he was taking Haldol and Seroquel, as well as heart issues, including hypertension.

16. During the intake performed during September 15, 2021 incarceration, Mildred Montalvo noted that the Decedent was experiencing signs of mental health illness.

17. It was also noted that the Decedent had been hospitalized on at least three different occasions in psychiatric hospitals for serious mental health issues and was taking Haldol.

18. At the time of his incarceration, Mr. Crummel was receiving social security disability benefits for his schizophrenia and other serious mental health issues.

19. Based on his intake, Mr. Crummel was placed on Level 1 suicide watch.

20. In addition, the intake performed during September 15, 2021, incarceration noted that at the time of his commitment, Mr. Crummel did not have any rashes.

21. On September 22, 2021, PrimeCare employees Shade Crawford, MA ("Crawford") and Robert Nichols, Psy.D. ("Nichols") evaluated the Decedent, and Nichols took the Decedent off suicide watch.

22. On September 25, 2021, Decedent tested positive for COVID-19, and because his oxygen levels were between 78% and 87%, he was taken to the Hospital (UPMC Harrisburg) for treatment.

23. At the Hospital, the Decedent developed Pneumonia, and after three days in the Hospital, he was returned to DCP, and placed in isolation because he was still testing positive for COVID-19.

24. On November 11, 2021, Mr. Crummel submitted a sick call request regarding a rash, tenderness and bleeding in his scrotum area.

25. Pursuant to the sick call request, the Decedent met with PrimeCare Medical, Inc. employee Marielle Ritchie ("Ritchie") on November 12, 2021, who did not examine Mr. Crummel's scrotum area, or diagnose his condition.

26. Indeed, Ritchie's notes from November 12, 2021 state that the affected area was "not visualized."

27. Instead, without examining or diagnosing the Decedent, Ritchie ordered the Decedent Bacitracin.

28. The order for Bacitracin was not approved, and the Decedent never received it or any other care for his condition at that time, leaving the Decedent's condition to worsen.

29. At the time the Decedent was seen by Ritchie on November 12, 2021, his rash, tenderness, and bleeding, which were left undiagnosed, were symptoms of Steven Johnson Syndrome ("SJS"), a serious medical condition that Mr. Crummel was suffering from that can be fatal, and if left untreated becomes extremely painful and causes the skin to blister and peel off.

30. On December 11/12, 2021, Mr. Crummel's mental and physical health visibly began to deteriorate; he stopped eating, and began yelling obscenities, banging on the door, drawing on the walls of his cell with his feces and urinating in his cell.

31. On December 13, 2021, PrimeCare employee Cheree Sultzbach ("Sultzbach") noted that the Decedent was purposefully flooding his cell with water to the point that the water was leaking out under the cell door and noted that Mr. Crummel was severely agitated and not responding to external stimuli.

32. Upon information and belief, it was common knowledge that the cells in Decedent's section of the prison were abnormally cold, as the freezing conditions in the M unit, which housed decedent, had well-documented heating conditions that had been discussed at Dauphin County prison board meetings. Moreover, it was known to all who interacted with Decedent and/or entered his cell, that his cell was dangerously cold. Armed with this knowledge and the fact that Decedent's cell was flooding, further exacerbating the dangers of a cold cell and making it more obvious that Decedent was in danger, Defendants still failed to provide any further care to Decedent.

33. Despite the fact that the Decedent was visibly decompensating and suffering a major mental breakdown, Defendants and their employees who witnessed Mr. Crummel's breakdown, and who therefore were also aware that Mr.

Crummel was suffering a serious mental breakdown, either through witnessing his conduct or the reading medical documentation regarding his behavior, made any attempt to treat the Decedent's serious mental health issues or accommodate his schizophrenia and other serious mental health issues by providing him the care and treatment he needed.

34. Instead, Defendants negligently failed to attend to Mr. Crummel's serious medical needs and were deliberately indifferent to the dangers he faced by remaining damp/wet prison cell covered in feces and urine that was not heated.

35. At the time Mr. Crummel was being housed in the damp/wet prison cell covered in feces and urine on December 13, 2021, DCP did not heat or inadequate heated in the prison cells, and more specifically in the Decedent's prison cell, and the average temperature for the day was 38.5 degrees Fahrenheit.

36. Upon information and belief, Prison Warden Greg Briggs knew prison cells were freezing cold, particularly in Unit B, which housed decedent. Warden Briggs provided warmer clothing to some inmates, but not all and failed to require his correctional officers to open decedent's cell doors to ensure that the warmer air cold circulate in his cell or otherwise find ways to ensure decedent was safe from harm.

37. Upon information and belief, meeting minutes from Dauphin County prison board meetings, which were open to the public, indicate that Warden Briggs

was aware Unit B was abnormally cold, that some inmates could see their breathes because of the cold while in their cells, icicles were forming on window sills from the inside of the prison, and that inmates were suffering from the cold, especially those with pre-existing medical conditions that made them more susceptible to the dangers of cold weather.

38. At the time Mr. Crummel was being housed in the damp/wet prison cell covered in feces and urine on December 13, 2021, DCP was so cold, the guards and other prison personnel were issued thermal clothing and winter parkas, which they wore while doing their jobs, while the prisoners, including the Decedent, were required to wear tee shirts and thin prison pants that resembled medical scrubs.

39. On December 15, 2021, Mr. Crummel vomited several times during the night, and Defendants and their employees reported that the Decedent's cell had a pungent smell, and there was vomit, food, urine, feces and water on the floor, and also that his physical health was rapidly declining.

40. Upon examination, Mr. Crummel's blood pressure was 188/102, his heartrate was 56, he was cold to the touch, he had a swollen right hand, he had slurred speech, he had lethargy, his mental status was noted as "confused," his pupils were slow to react, and he was having difficulty following commands and standing.

41. As a result of the Decedent's rapidly declining physical condition, he was taken to the Hospital, where he stayed for less than 24 hours, and it was determined that he had "low potassium".

42. Upon being returned to DCP, Decedent's symptoms had not been resolved, and on December 17, 2021, PrimeCare Medical Provider Lauri Case, PMHNP-BC noted that Mr. Crummel's cell was still flooded and scattered with food debris.

43. Despite the fact that Decedent's symptoms had not resolved, and his cell was flooded and littered with food debris, feces and urine, neither Defendants, all of whom were responsible for treating the Decedent and were aware of his declining health, and also were aware of the deplorable, inhuman condition of his cell from the medical records, made any effort to treat Mr. Crummel for his declining health or made any effort to alleviate the inhuman conditions in his cell.

44. Instead, Defendants ignored the Decedent's visibly declining health and the inhuman conditions in his cell, the Defendants negligently failed to attend to his serious medical needs and were deliberately indifferent to the inhuman conditions in which Mr. Crummel was being housed.

45. On December 19, 2021, PrimeCare Medical Providers Tia Drabich (Drabich") and Stephanie Deitz, RN. ("Deitz"), requested permission to enter the Decedent's cell to conduct a physical examination, and they discovered that Mr.

Crummel had slurred speech, dry oral mucosa, macerated skin on his hands and feet, incontinence, tachycardia, was breathing abnormally and smelled of urine.

46. Drabich noted "Multi system organ failure."

47. The cold, unsanitary, wet conditions of the Decedent's cell, which all of the Defendants were aware of through the medical records, exacerbated and accelerated Mr. Crummel's declining physical and mental health.

48. PrimeCare COO Todd Hoskins was contacted regarding the condition that the Decedent was found in on December 19, 2021, and Mr. Crummel was taken to the Hospital (UPMC Harrisburg).

49. Upon arrival at the hospital, it was noted that the Decedent was bradycardic (had a slow heart rate) and hypotensive (abnormally low blood pressure), appeared physically ill, and had a core body temperature of 85 degrees Fahrenheit.

50. The Decedent's mental and physical condition was so precarious that the hospital considered calling a stroke alert, but providers eventually conducted a CT scan and ruled out a brain bleed.

51. After further examination, it was discovered that Mr. Crummel had cherry red non-blanching rash on his medial thighs, tip of his penis, buttocks and lower back region, and his skin was sloughing on is bilateral wrists and feet.

52. Testing indicated that the Decedent had an acute kidney injury and leukopenia, abnormal blood glucose, lactic acid, c-reactive protein and creatine readings.

53. He was also noted to have diffuse sloughing on his skin (and erythematous rash), hypothermia, acute kidney injury, altered mental status, and Systematic Inflammatory Response Syndrome ("SIRS"), which is an exaggerated defense response of the body to a noxious stressor such as infection or acute inflammation.

54. Decedent was admitted to the ICU for multi-system organ failure and was placed on a Bear Hugger Temperature Monitoring System to treat his Hypothermia.

55. In December of 2021, Dr. Khanal from UMPC's ICU contacted Defendants Dauphin County and/or PrimeCare to enquire about the rash on the Decedent's body, which had been photographed by the Hospital and showed extreme scaling of his skin.

56. Despite the fact that Mr. Crummel had submitted a sick call request and was seen by Ritchie regarding his rash in November of 2021, Nicole Gallup informed Dr. Khanal that the Decedent had been incontinent and smelled of urine, but that the Defendants were unaware of any rash.

57. The fact that PrimeCare had no record of Decedent's rash from November underscores the seriousness of the failures by Ritchie and PrimeCare, which apparently include failing to chart her findings and ignoring the seriousness of Decedent's medical condition.

58. On December 21, 2021, a biopsy was performed on Mr. Crummel's rash, which determined that the rash was Johnson Syndrome/Toxic Epidermal Necrolysis ("SJS/TEN").

59. SJS/TEN is a potentially fatal condition where the skin begins to blister and peel, forming very painful raw areas called erosions that resemble a severe hot-water burn. The condition damages the mucous membranes, including the lining of the mouth and the airways which impacts breathing and swallowing. The painful blistering also affects the urinary tract and genitals. The condition is fatal in up to 50% of those who suffer from Steven Johnson Syndrome and Toxic Epidermal Necrolysis, which the Decedent had.

60. While at the hospital, Mr. Crummel's skin condition was so severe that the Hospital recommended transferring him to a burn unit at Mercy Hospital in Pittsburgh, however the Defendants would not permit him to be transferred to the burn unit.

61. Mr. Crummel's pain was so severe that the medical providers at the Hospital were unable to get it under control for several weeks.

62. Mr. Crummel spent 36 days in the Hospital and was released back to DCP on January 24, 2022 at 1:23 pm.

63. Upon Mr. Crummel's return to DCP in January, the average temperature was below freezing, or 25 degrees colder than it had been in December when the Decedent developed Hypothermia.

64. Notwithstanding the frigid temperatures, Mr. Crummel's cell still did not have heat.

65. Indeed, despite the fact that the Decedent had developed hypothermia in December, when the temperatures were much warmer, and despite the fact that the Decedent was recovering from a near fatal disease/illness, and despite the fact that the Decedent was still suffering severe mental issues and was unable to advocate for himself, upon Mr. Crummel's return to DCP on January 24, 2022, Defendants placed him in the same cell/cold part of the prison that he had been in before he was Hospitalized for 36 days, and failed to provide him additional warm clothing or additional blankets, but instead required him to remain in his freezing cell in just a tee shirt and thin prison pants for 23 out of 24 hours a day.

66. Before Mr. Crummel's return to DCP in January, he was initially showing signs of improvement from his prior condition before he was hospitalized.

67. But, upon returning to the prison, and being placed in his same freezing cold cell, Mr. Crummel soon began exhibiting many of the symptoms that he

exhibited prior to being hospitalized for hypothermia, including lethargy, failure to eat, slow speech and the inability to communicate with Defendants.

68. On January 25, 2022, Martin documented:

> Patient seen in medical office. Patient was treated at Harrisburg for a variant of Steven Johnson syndrome (TEN) it was felt it was due reaction to Depakote; However our records indicated he was not taking depakote. Patient has a diagnosis of Schizoaffective Disorder, bipolar; He was started on lnvega during his stay at Harrisburg Hospital. The Haldol and cogentin which he had been on were stopped. Clonidiine was also stopped; Clonazepam was stopped yesterday before arriving here. The patient today spoke with slurred speech; he was delusional and grandiose.; he also manifested loose associations and flight of ideas

69. On January 28, 2022, Sultzbach documented:

> this nurse went to block with ordered injection at approx 0820 pt appeared very lethargic when this nurse entered cell. Pts speech was slow and mumbled. Pt was not in agreeance with ordered injection at this time reports " i just got my injection" showing this nurse his bandaid on his right arm. Pt was correct and received first injection of lnvega Sustenna prior to release at the hospital (1/21/22) Pt stated" Im not to get it for another month. Pt was not willing to receive ordered injection. Spoke to med nurse pt refused am medications as well. Discussed with Provider. continue to offer through out the weekend.

70. On January 30, 2022, Thomas documented that the Decedent refused his AM medication, refused to answer if he wanted his meds. and that he just sat on his bed and said nothing.

71. On the morning of January 31, 2022, at 5:27, Magwood documented as follows:

> This nurse was called to see patient in his cell due to being lethargic and face lying on bed in cell. Attempted to get vitals on patient but he

> became combative and starting yelling. Patient did not eat dinner and appears to be in an altered mentally state. Patient has been tasked to provider line for review and further evaluation.

72. Despite noting this urgent situation, mental health was not notified until, at the earliest, more than an hour later, and possibly more than three hours later.

73. On January 31, 2022, at 11:59 a.m., a late entry reflecting a 7:50 a.m. visit with Decedent, Defendant Rosas documented as follows:

> Late entry from 0750h. After receiving verbal report from nursing staff indicating IM was in some type of agitated state that represented a mental status change that occurred at some point over the weekend, as best understood at that time. This author went on to M unit prior to daily AM interdepartmental meeting (PCM and treatment staff members in attendance) in observe IM's status. I was escorted to M13 by CO Burns and observed IM Crummel laying face down, facing interior wall (away from window), partially covered as right leg and also blank were hanging off partially off the bed. Slight movement observed, no distress or signs of acute medical event observed. Objective of this interaction was to determine current mental status and to report details to BHS team and psych provider in order to develop plan of care accordingly. Details and finding provided verbally to BHS team members. Following AM meeting, upon returning to medical dept approx 0915h, medical emergency radio call occurred and this author provided support activities pursuant to acute medical event.

74. Prior to Rosas visit with Decedent, Rosas received a verbal update from the nursing staff that morning stating that Decedent was deteriorating and about his worsening mental and physical condition.

75. In addition, upon Rosas' observation of Decedent on the 31st, it was apparent that Decedent's cell was unsafe because of how cold it was, and that Decedent was neither adequately clothed nor adequately covered for the temperature

in his cell. Moreover, upon Rosas' review of Decedent's medical record, he was aware that Decedent suffered from hypothermia previously during this incarceration, and had just returned from the hospital, and therefore his physical and mental health needed to be closely monitored.

76. Rosas, as a medical provider, had a duty to examine Decedent at that juncture and assess Decedent's condition, given how cold the cell was, the fact that Decedent had already suffered from hypothermia, had just returned from the hospital with a severe, and potentially life-threatening condition, and appeared to barely move while being observed, and his failure to do so was a substantial factor in the harm suffered by Decedent.

77. In another late entry from January 31, 2022, with no corresponding time of visit, Stokes documented as follows:

> During AM pill call inmate was asleep in prone position. When asked if he wanted his morning medicine inmate made responded with a quiet "mmm" sound but did not move. Nurse observed inmate's back rising and falling with a normal rhythm. Mental health was informed about mental decline. At approximately 0930 medical emergency was call for unresponsive episode. All available medical staff responded. CPR was initiated and EMS was called. AED was applied with no shock advised. Several cycles of CPR were performed until directed by EMS to stop compressions.

78. On January 31, 2022, at 10:56 a.m., the following was documented:

> Medical Emergency called at 0929 for inmate being unresponsive. At approximately 0930, this nurse. MA Katie M, Autumn B, Jess N and Shade C arrived at the patients cell. Patient was lying prone on his bunk with his face positioned to the right. This nurse checked for a pulse, no

> pulse found, this nurse and CO Burns flipped the patient over onto his back where it was then noted that the patient had frothy secretion coming from his mouth, incontinent of urine and had fixed pupils. Compressions were immediately started approx 0930. AED was applied by Katie M, MA - no shocks were advised. CPR was continued and EMS was called and arrived on scene at approx. 0938 where EMS then took charge of code. This nurse along with other medical staff on scene, continued rotating CPR and other directives/tasks as per EMS/paramedic.

79. It was further documented that Mr. Crummel's eyes were open, fixed, and dilated, he appeared to have wet himself and his skin was cold to the touch.

80. Defendants called 911, but all efforts to revive Mr. Crummel were futile, and he died.

81. The coroner determined that the cause of death was Hypothermia.

82. On January 31, 2022, Sultzbach also documented that ***no food logs were entered since January 26, 2022***.

83. Following January 26, 2022, when the Decedent stopped eating, the Decedent was seen by, among others, employees of PrimeCare.

84. Aside from the failures of Defendant PrimeCare, it was the prison's job to feed, clothe, and keep safe decedent. The fact that the correctional officers interacting with decedent and/or stationed in his unit failed to respond to decedent not eating, dealing with physical and mental health challenges, and being held for 23 hours a day in a freezing cold cell highlights DCP's indifference to decedent's suffering.

85. After Mr. Crummel's death, the District Attorney for Dauphin County admitted to reporters that the area in the prison where the Decedent was housed was much colder than other parts of the prison.

86. Despite the fact that Mr. Crummel was exhibiting many of the symptoms associated with Hypothermia, Defendants failed to monitor his vitals or move him to a warmer part of the prison and were deliberately indifferent and/or negligently failed to attend to his serious medical needs and his right to humane conditions of confinement.

87. Defendant Dauphin County was responsible for ensuring that inmates were provided safe and humane conditions of confinement, including ensuring that DCP was adequately heated in the winter months.

88. Defendant Dauphin County was deliberately indifferent to Decedent's health and safety and created inhumane conditions of confinement when they failed to ensure that the Decedent's cell had adequate heat, and they failed to ensure that the Decedent had adequate clothing and blankets to ward of the cold during the winter months.

89. Defendant Dauphin County knew that the Decedent had been Hospitalized for 36 days for Hypothermia and near fatal diseases/illness and were deliberately indifferent to the Decedent's health and safety, and created inhumane conditions of confinement when, upon the Decedent's return to DCP in January of

2022 after suffering from Hypothermia and other near fatal diseases/illnesses, they did not require that the Decedent be placed in a warmer part of the prison that had heat, or that the Decedent be provided warmer clothes and more blankets but instead allowed him to be placed in the same cold cell or area of the prison with the bare minimum of clothes and blankets to ward off the cold.

90. Defendant Dauphin County knew that the Decedent had been allowed to remain for days in his cell, covered in feces and urine and in wet conditions caused by the flooding of the cell, and that these conditions contributed to his Hypothermia and exacerbated and accelerated his declining physical and mental condition, and were deliberately indifferent to the Decedent's health and safety, and created inhumane conditions of confinement when they failed to address and alleviate the conditions in which the Decedent was being housed.

91. Defendant Dauphin County had an unconstitutional custom, practice and policy of acquiescing in unconstitutional, inhumane conditions of confinement, including a lack of adequate heat/clothing/blankets in DHP during the winter months, and permitting inmates to remain for days in cells covered in water, feces, urine and food.

92. Defendant Dauphin County had an unconstitutional custom, practice and policy of not providing adequate heat or adequate clothing during the winter

months that was the direct and/or proximate cause of the Decedent dying of Hypothermia and resulted in inhumane conditions of confinement.

93. Defendant PrimeCare Medical, Inc., negligently failed to institute adequate customs, practices and policies regarding the training of Health Care Providers hired by PrimeCare to provide health care to the prisoners at DCP, which included failure to adequately train the health care providers regarding the need to examine and diagnosis inmates with medical conditions, to treat inmates with serious medical conditions, to ensure that the inmates are housed in sanitary conditions, to ensure that the inmates are prescribed and receive needed medications, to monitor inmates who are suffering from serious mental and physical medical conditions, and to not attempt to cover up their deliberate indifference by downplaying an inmates serious medical condition in the medical documents or by lying regarding an inmates serious medical condition to other health care providers.

94. Defendant PrimeCare negligently failed to institute customs, practices and policies regarding the need to adequately examine and diagnosis inmates with medical conditions, to treat inmates with serious medical conditions, to ensure that the inmates are housed in sanitary conditions, to ensure that the inmates are prescribed and receive needed medications, to monitor inmates who are suffering from serious mental and physical medical conditions, and to not attempt to cover up their negligence by downplaying an inmates serious medical condition in the

medical documents or by lying regarding an inmates serious medical condition to other health care providers.

95. The need for Defendant PrimeCare to have more adequate training and customs, practices and policies regarding the need adequately to examine and diagnosis inmates with medical conditions, to treat inmates with serious medical conditions, to ensure that the inmates are housed in sanitary conditions, to ensure that the inmates are prescribed and receive needed medications, to monitor inmates who are suffering from serious mental and physical medical conditions, and to not attempt to cover up their negligence by downplaying an inmates serious medical condition in the medical documents or by lying regarding an inmates serious medical condition to other health care providers is obvious and would be obvious to a lay person.

96. Defendant PrimeCare Medical, Inc. promulgated customs, practices and policies were the direct and proximate cause of the Decedent's prolonged suffering and death.

97. Defendant PrimeCare Medical, Inc. negligently ignored the Decedent's serious medical needs by, among other things:

a. Failing to examine, diagnosis and treat the Decedent's rash.

b. Failing to diagnose and treat the Decedent's Schizophrenia and serious mental health issues.

c. Failing to diagnose and treat the Decedent's SJS/TEN.

d. By allowing the Decedent to remain in his cell when it was unsanitary and covered in feces, urine, vomit, food, water and was dangerously cold.

e. By failing to diagnosis and treat Decedent's Hypothermia.

f. By failing to examine the Decedent before prescribing medication or by denying the Decedent needed medication without examining or diagnosing him.

g. By failing to monitor the Decedent when he returned to DCP from the Hospital in January and by failing to address the conditions that caused Hypothermia when he returned to DCP in January.

h. By downplaying the Decedent's serious medical condition on medical documents, resulting in his not receiving treatment.

i. By lying regarding the Decedent's serious medical condition to other medical providers, resulting in his not receiving treatment.

98. Defendant Dauphin County was deliberately indifferent to the Decedent's serious medical needs by, among other things:

a. Failing to examine, diagnosis and treat the Decedent's rash.

b. Failing to diagnose and treat the Decedent's Schizophrenia and serious mental health issues.

c. Failing to diagnose and treat the Decedent's SJS/TEN.

d. By allowing the Decedent to remain in his cell when it was unsanitary and covered in feces, urine, vomit, food and water.

e. By failing to diagnosis and treat Decedent's Hypothermia.

f. By failing to examine the Decedent before prescribing medication or by denying the Decedent needed medication without examining or diagnosing him.

g. By failing to monitor the Decedent when he returned to DCP from the Hospital in January and by failing to address the conditions that caused Hypothermia when he returned to DCP in January.

h. By downplaying the Decedent's serious medical condition on medical documents, resulting in his not receiving treatment.

i. By lying regarding the Decedents serious medical condition to other medical providers, resulting in his not receiving treatment.

99. Defendant Rosas negligently ignored Decedent's serious medical needs by, among other things:

a. Failing to examine, diagnosis and treat the Decedent's rash.

b. Failing to diagnose and treat the Decedent's Schizophrenia and serious mental health issues.

c. Failing to diagnose and treat the Decedent's SJS/TEN.

d. By allowing the Decedent to remain in his cell when it was unsanitary and covered in feces, urine, vomit, food, water and was dangerously cold.

e. By failing to diagnosis and treat Decedent's Hypothermia.

f. By failing to examine the Decedent before prescribing medication or by denying the Decedent needed medication without examining or diagnosing him.

g. By failing to monitor the Decedent when he returned to DCP from the Hospital in January and by failing to address the conditions that caused Hypothermia when he returned to DCP in January.

h. By downplaying the Decedent's serious medical condition on medical documents, resulting in his not receiving treatment.

i. By lying regarding the Decedents serious medical condition to other medical providers, resulting in his not receiving treatment.

100. The above combined negligence of Defendants PrimeCare and Rosas, and the deliberate indifference of Defendant Dauphin County were the proximate cause of Decedent's suffering, pain, and death.

**COUNT I – 42 U.S.C. § 1983**
**DUE PROCESS—INHUMAN CONDITIONS OF CONFINEMENT**
**PLAINTIFF v. DAUPHIN COUNTY**

101. All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

102. Dauphin County knew that DCP was not adequately heated, it was winter, and the outside temperature was extremely cold and that the inmate at DCP were only dressed in a tee shirt and thin prison pants and had only one blanket.

103. Dauphin County knew that the Decedent had been required to remain in his cell for extended periods of time and that his cell was covered in water, feces, vomit, urine and food and was unsanitary.

104. After Decedent had returned to DCP from the Hospital in January of 2022, Dauphin County knew that developed Hypothermia in the prison in December of 2021, when the temperatures were much warmer, yet the Decedent was returned

to the same cold, heatless cell in the cold part of the prison, with only a tee shirt, thin prison pants and one blanket.

105. The condition of Decedent's cell was inhumane and constituted an inhumane condition of confinement.

106. Dauphin County was deliberately indifferent to the inhuman conditions of confinement the Decedent was required to endure while housed at DCP.

107. As the direct and proximate result of Dauphin County's deliberate indifference to the inhumane conditions of confinement the Decedent was suffered in psychological and physical pain and died.

**WHEREFORE**, pursuant to 42 U.S.C. §1983 and §1988, Plaintiff demands compensatory against Dauphin County in an amount sufficient to fully and adequately compensate the Plaintiff, plus interest, costs, attorney's fees and all other appropriate relief.

## COUNT II – 42 U.S.C. § 1983
## MONELL CLAIM
## PLAINTIFF v. DAUPHIN COUNTY

108. All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

109. Defendant Dauphin County has adopted and maintained for many years a recognized and accepted policy, custom, and practice of condoning and/or the acquiescence of the deliberate indifference to serious health and safety risks of

arrestees, detainees and inmates, including the Decedent, and of subjecting them to the same type of treatment to which Decedent was subjected, which policy violates the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States.

110. The aforementioned unconstitutional policy, custom and practice includes failing to provide adequate policies and procedures regarding the need for correctional officers to not be deliberately indifferent to the suffering of inmates who are left to freeze in their respective cells, including the Decedent, and failing to provide human conditions of confinement, which includes, but is not limited to, failing to provide adequate heat in DCP during the winter months, and allowing mentally ill inmates/pretrial detainees to remains in cell covered in feces and urine and water from flooding of the cell.

111. The aforementioned unconstitutional policy, custom and practice include failing to provide adequate training of correctional officers regarding the need to ensure inmates were safe and not suffering because of cold cells, including the Decedent, and failing to train correctional officers on the need to ensure that the conditions in which the inmate is housed are sanitary and humane.

112. Defendant Dauphin County failed to implement more adequate policies and procedures regarding the requirement to examine, diagnose and treat inmates/pretrial detainees with serious mental and physical medical conditions and

to ensure sanitary and humane conditions of confinement is obvious, and the failure of the aforementioned Defendant to provide constitutes deliberate indifference in violation of the Decedents right to a safe and human conditions of confinement under the Due Process Clause of the Fourteenth Amendment.

113. Warden Briggs was the policymaker and/or sanctioned these failures by both allowing these practices to continue, despite being fully aware of the harm it was causing to inmates. As fully plead throughout this complaint, it was common knowledge that the inhumane conditions persisted throughout the prison and that inmates were cold and suffering, yet Warden Briggs failed to institute policies and practices that rectified these failures.

114. As the direct and proximate cause of Defendant Dauphin County, Decedent’s right under the Due Process Clause were violated and he suffered prolong pain and agony and died.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983 and Pennsylvania Law, the Plaintiff, as administrator for the Estate of Jamal Crummel, demands compensatory damages against defendants, jointly and/or severally, in an amount sufficient to fully and adequately compensate the Plaintiff, plus interest, costs, attorney's fees and all other appropriate relief.

## COUNT III – CORPORATE NEGLIGENCE/GROSS NEGLIGENCE PLAINTIFF v. PRIMECARE MEDICAL, INC.

115. All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

116. The direct corporate negligence, gross negligence and carelessness of Defendant PrimeCare Medical, Inc. includes, but is not limited to:

a. Failure to properly train its employees, agents, and ostensible agents regarding the need to ensure that inmates with serious mental and physical medical conditions are examined, diagnosed and treated.

b. Failure to properly train its employees, agents, and ostensible agents regarding the need for sanitary and humane conditions in the cells;

c. Failure to formulate, adopt, and/or enforce adequate rules, policies and/or procedures to ensure that inmates with severe mental health issues receive needed medicines and psychological services such as counseling, therapy and psychiatric assessments;

d. Failure to establish policies to ensure that inmates with severe mental and physical health issues that are being monitored or seen as recommended and on a regular basis;

e. Failure to train its employees, agents, and ostensible agents in identifying conditions in cells that were dangerous to the inmate's health and well-being, including identifying conditions that could lead to hypothermia;

f. Failure to discipline its employees, agents and ostensible agents in instances where a prisoner's health and well-being declined and the prisoner suffered because of the conditions in the cell and the employee, agent and ostensible agent carelessly ignored the known dangers in the cell.

117. Defendant PrimeCare Medical, Inc., had actual and/or constructive knowledge of the above acts and omissions which caused harm, increased the risk of harm, and were substantial factors in causing the injuries and wrongful death of the Decedent.

118. The direct corporate and/or gross negligence and carelessness of Defendant PrimeCare Medical, Inc. set forth herein caused harm, increased the harm, and was a substantial factor in causing the injuries and wrongful death of the Decedent.

**WHEREFORE**, pursuant to Pennsylvania Law, the Plaintiff, as the administrator of the Estate of Jamal Crummel, demands judgment against Defendant PrimeCare Medical, Inc. for an amount in excess of One Hundred Fifty Thousand ($150,000.00), including all damages available, including compensatory against Defendant PrimeCare Medical, Inc., plus interest, costs, and all other appropriate relief.

## COUNT IV – NEGLIGENCE/VICARIOUS LIABILITY PLAINTIFF v. PRIMECARE MEDICAL, INC. AND ROSAS

119. All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

120. Defendants had a duty to render reasonable, proper, adequate and appropriate medical care to Plaintiff's Decedent and to protect him from harm.

121. As detailed above, the aforementioned Defendants, PrimeCare and Rosas, and the other PrimeCare employees were negligent and careless, and

breached their duty of care the Plaintiff's Decedent, and said negligence and carelessness was a substantial factor causing the injuries and wrongful death of the Decedent.

122. Defendant PrimeCare Medical, Inc. is liable for the negligent conduct of its employees pursuant to the principles of agency, ostensible agency, vicarious liability and/or respondeat superior.

**WHEREFORE**, pursuant to Pennsylvania Law, the Plaintiff, as the administrator of the Estate of Jamal Crummel, demands judgment against Defendant PrimeCare Medical, Inc. for an amount in excess of One Hundred Fifty Thousand ($150,000.00), including all damages available, including compensatory against Defendant PrimeCare Medical, Inc. and Rosas, plus interest, costs, and all other appropriate relief.

## COUNT V – WRONGFUL DEATH
## PLAINTIFF v. PRIMECARE MEDICAL, INC. AND ROSAS

123. All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

124. Plaintiff brings this action pursuant to the Wrongful Death Act 42 Pa. C.S.A. Section 8301 and claims all damages recoverable under the Pennsylvania Wrongful Death Act.

125. As a direct and proximate result of the aforementioned actions of the Defendants, the Decedent, Jamal Crummel, his family and his estate have suffered severe emotional and pecuniary losses and damages including the following:

(a) an amount which will cover all funeral, burial and estate administration expenses incurred;

(b) an amount which will fairly and adequately compensate the family members of the decedent for their loss of such contributions as they would have received between the time of the death of the decedent and today. This includes all monies that the decedent would have spent for or given to his family;

(c) an amount which will fairly and adequately compensate his family for the loss of such contributions as the decedent would have contributed to the support of his family between today and the end of his normal life expectancy; and

(d) an amount which will fairly and adequately compensate his family for the pecuniary and emotional value of the services, society and comfort that he would have given to his family had he lived including such elements as provision of physical comfort and services and provision of society and comfort.

126. As a direct and proximate result of the Defendants' wrongdoing as set forth above, which is incorporated herein, Jamal Crummel's Wrongful Death beneficiaries suffered, are suffering, and will, for an indefinite period of time in the

future, suffer damages, injuries and losses including but not limited to, a loss of financial support, and the beneficiaries have been wrongfully deprived of the contributions they would have received from him, including monies which he would have provided for items such as clothing, food, shelter, medical care, education and entertainment, recreation and gifts.

127. As a direct and proximate result of Defendants PrimeCare and Rosas wrongdoing as set forth above, which is incorporated herein, Jamal Crummel's Wrongful Death beneficiaries have been caused to incur and pay various expenses for medical treatment, hospital care, custodial care, nursing care and medications, and funeral and other expenses related to his death.

**WHEREFORE**, pursuant to Pennsylvania Law, the Plaintiff, as the administrator of the Estate of Jamal Crummel, demands judgment against the PrimeCare Defendants for an amount in excess of One Hundred Fifty Thousand ($150,000.00), including all damages available, including compensatory against Defendants PrimeCare Medical, Inc. and Rosas, plus interest, costs, and all other appropriate relief.

## COUNT VI – SURVIVAL ACTION
## PLAINTIFF v. PRIMECARE MEDICAL, INC. AND ROSAS

128. All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

129. Plaintiff brings this action on behalf of the Estate of Jamal Crummel, deceased, by virtue of the Survival Act, 42 Pa.C.S.A. § 8302, and claims all benefits of the Survival Act on behalf of the Estate of Jamal Crummel and other persons entitled to recover under law.

130. As a direct and proximate result of the aforementioned actions of the defendants, the decedent, Jamal Crummel, his family and his estate are entitled to damages which shall include the following:

(a) an award of the total net amount that the decedent would have earned between the date of his death and today;

(b) an award of the net amount that the decedent would have earned between today and the natural end of the decedent's life expectancy; and

(c) an award of such an amount as will fairly and adequately compensate the estate for the mental and physical pain and suffering that the decedent endured from the moment of the improper treatment by the defendants to the moment of his death as a foreseeable result of the improper treatment.

131. As a direct and proximate result of Defendants' wrongdoing as set forth above, which is incorporated herein, Plaintiff claims on behalf of the Estate of Jamal Crummel, all damages suffered by the Estate by reason of the death of Jamal Crummel, including without limit the generality of the following: the severe injuries to Jamal Crummel, which resulted in his death; the anxiety, horror, fear of impending

death, mental disturbance, pain, suffering and other intangible losses which Jamal Crummel suffered prior to his death; the loss of past, present and future earning capacity suffered by Jamal Crummel, from the date of his death until the time in the future he would have lived had he not died as a result of the injuries he sustained; expenses for medical care; the loss and total limitation and deprivation of his normal activities, enjoyment of life, pursuits and life's pleasures from the date of his death until such time in the future as he would have lived had he not died as a result of the injuries sustained.

**WHEREFORE**, pursuant to Pennsylvania Law, the Plaintiff, as the administrator of the Estate of Jamal Crummel, demands judgment against Defendant PrimeCare Medical, Inc. for an amount in excess of One Hundred Fifty Thousand ($150,000.00), including all damages available, including compensatory against Defendants PrimeCare Medical, Inc. and Rosas, plus interest, costs, and all other appropriate relief.

**STAMPONE O'BRIEN DILSHEIMER LAW**

/s/ Brock J. Atkins

KEVIN O'BRIEN, ESQUIRE
BROCK J. ATKINS, ESQUIRE
500 Cottman Avenue,

Cheltenham, PA 19012
Attorneys for Plaintiff